## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

-vs-

D-16 STEVEN GOLDSTEIN,

                    Defendant.

_____/

No.   14-20599

HON. STEPHEN J. MURPHY, III

VIOLATION(S):
Count 1: 18 U.S.C. § 1349

OFFENSE(S):
Count 1: Conspiracy to Commit
Wire/Mail Fraud

MAX. PENALTY:
Count 1: 20 years imprisonment

MAXIMUM FINE:
Count 1: $250,000

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure,

defendant STEVEN GOLDSTEIN and the government agree as follows:

1.     GUILTY PLEA

    A.    **Count(s) of Conviction**

Defendant will enter a plea of guilty to **Count One** of the First

Superseding Indictment, which charges defendant with conspiracy to

commit wire and mail fraud in violation of 18 U.S.C. § 1349.

**B.    Elements of Offense(s)**

The elements of the offense, which the government would have to

prove beyond a reasonable doubt, are:

I.    Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire/mail fraud, as charged in the First Superseding Indictment.

Wire & Mail Fraud

I.    The defendant knowingly participated in a scheme to defraud in order to obtain money or property, that is a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises;

II.    The scheme included a material misrepresentation or concealment of a material fact;

III.    The defendant had the intent to defraud; and

IV.    The defendant caused to be delivered by mail any manner or thing in furtherance of the scheme, or used wire communications in interstate commerce in furtherance of the scheme.

**C.    Factual Basis for Guilty Plea**

The following facts are a sufficient and accurate basis for

defendant's guilty plea:

## Introduction

STEVEN GOLDSTEIN and others agreed to participate in a telemarketing fraud scheme in which victims were lured into purchasing residential properties in Detroit, Michigan and elsewhere based upon false representations and pretenses, including falsehoods concerning the homes' values and status as bank-owned properties. In addition, by using sham transactions, the scheme induced victims into believing that there is a ready market and process for "flipping" these same residential properties to purported hedge funds and foreign investors, which had the desired effect of encouraging the scheme's victims to purchase multiple homes. From December 2009 through March 2014, the telemarketing scheme sold over 2,000 properties totaling over $20 million to over 290 victims from 46 states and Canada.

The telemarketing scheme operated from December 2009 through March 2014. From February 2013 through September 2013, GOLDSTEIN worked at the telemarketing scheme's call center soliciting victims. GOLDSTEIN made affirmative misrepresentations and material omissions to victims. GOLDSTEIN used the alias of Steven Sommers when communicating with victims.

## The Defendants' Affirmative Representations to Investors

During telemarketing calls, GOLDSTEIN and others made the following affirmative representations, among others, to investors:

a. The telemarketer represented that it could purchase bank-foreclosed residential properties for its investors at extremely low prices based upon the telemarketer's purported "relationship" with the banks that own the properties after foreclosure. Moreover, the telemarketers told investors that the prices at which they can purchase the residential properties were a fraction of the mortgage balances left on the properties.

- 3 -

b.  The telemarketer represented that it was prohibited from
directly purchasing the residential properties itself because
federal law purportedly prohibited any one person or company
from purchasing more than 10% of a bank's distressed assets.
Accordingly, the telemarketer stated that it needed to work
through individual clients (*i.e.*, the investors) to purchase these
homes. Thus, the telemarketer represented that, through the
investors' participation, it was able to purchase all of the bank's
distressed assets, thereby convincing the banks to provide even
greater discounts to the telemarketer's investors.

c.  The telemarketer represented that, upon purchasing the
property for the investor at a purportedly favorable price, the
telemarketer would then resell the houses to so-called hedge
funds or foreign investment companies at a significant profit.
Moreover, the telemarketer represented that it bundles its
various investors' purchased homes into blocks, often consisting
of groups of approximately forty homes, and thereafter sells
them in bulk to the hedge funds or foreign investors.

d.  The telemarketer represented to the investors that it did not
make any money on the investor's purchase, but would receive
a twenty percent commission on the resale of the investor's
recently-acquired property which, according to the
telemarketer's representations, usually took only a few weeks
or less.

e.  The telemarketer encouraged investors to start with a single
residential real estate purchase which can be obtained for
between $10,000 to $15,000. Shortly after the purchase, the
telemarketer notified the investor that there has been an "offer"
or multiple "offers" on his/her residential property. The
investor was encouraged to accept the offer, but then reinvest
or roll their "profits" on the single transaction into the
subsequent purchase of multiple houses. The telemarketer

- 4 -

referred to the reinvestment of an investor's purported profits into the purchase of multiple houses as "the load."

### Falsehoods, Misrepresentations and Omissions

These affirmative representations were false and misleading. In addition, GOLDSTEIN and others failed to disclose, or omitted, material facts necessary for investors to determine that the representations were false and misleading.

In reality, the telemarketing scheme designed the original single residential real estate investment to falsely portray the ability of the telemarketer to produce quick profits so that it could further lure the investor into making a more substantial purchase of multiple homes.

Contrary to the representations made to investors, the properties were not bank-owned and were not being made available to investors for a fraction of the mortgage balance left on the properties. Instead, the properties were recently-purchased homes (or as-of-yet-to-be purchased homes) owned, not by any bank whatsoever, but by the aforementioned Holding Companies which were controlled by the co-conspirators involved in the telemarketing fraud. Moreover, the homes were routinely purchased by one of the Holding Companies for much less (*e.g.*, $500) and then quickly resold to the investors for much more (*e.g.*, $10,000 to $15,000).

Contrary to the representations made to investors, the properties were not quickly sold or "flipped" to hedge funds or foreign investors as part of a block of properties. Instead, they were sold to Shell Buyers for little or no consideration in an attempt to portray a ready market for flipping homes in Detroit, Michigan, which would encourage the investors to purchase larger quantities of real estate from the telemarketing scheme. The Shell Buyers were controlled by the co-conspirators who operated the telemarketing scheme. Notwithstanding this fact, the investors were falsely told that the property had received a

so-called "offer" or multiple "offers" and that it was ultimately sold for a profit. Thereafter, the investors were sent "Commission Statements" that showed the purchase price and the balance that the investor purportedly had in an escrow account, which consisted of the original amount paid for the property and the purported "profit" earned on the flip/sale. The escrow agent failed to collect any payments from the "buyer" who purchased the property (*i.e.*, the "Shell Buyers") and no such amounts were actually held in escrow for the investors.

After the investor was fraudulently induced into believing there is a ready-market for flipping foreclosed or distressed residential properties for a profit in Detroit, sales agents from the telemarketing scheme then attempted to convince the investor to use their purported "profits" in escrow to purchase even more properties. Numerous investors declined to withdraw the money that they were led to believe was in their escrow accounts, and instead sent substantial additional sums to the telemarketing scheme (through the escrow agent) for additional property purchases.

Once the telemarketing scheme convinced the investors to purchase a larger block of homes in Detroit (*i.e.*, "the load"), the telemarketing scheme failed to flip the properties and, contrary to the agent's sales pitch, appeared to not make any additional efforts to resell the properties. Communications with the telemarketer then became increasingly more difficult and eventually ceased altogether. The investors were then left possessing multiple Detroit residential properties with little value (*i.e.* $500-$1,000 each).

Sales agents of the telemarketing scheme also engaged in a marketing practice that they called "the reload," which targeted investors who were previously defrauded into buying a block of properties in Detroit. Sales agents would contact these investors and falsely claim that they had a hedge fund or foreign investors who were purchasing block of properties in a specific number (*e.g.*, a block of eight homes). The investor victim, who was previously defrauded into buying

a smaller block of homes (*e.g.*, five homes), would be encouraged to purchase more homes so that he/she would have the requisite number of homes so that they could sell the entire block to the hedge fund or foreign investor. As with the previous sales pitches, there were no hedge funds or foreign investors involved in the transaction and the sales pitch was false.

Throughout the sales pitches, investors are led to believe that arms-length transactions are taking place between the various entities, but in reality, all of the companies involved in the scheme are interconnected and controlled by the same individuals.

For the purpose of executing and attempting to execute the scheme, the defendants did transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs, signals and sounds. These included wire transfers of money, emails, text messages, and telephone calls. They also knowingly caused to be delivered by mail the following items: real estate deeds, commission statements, property sheets, marketing material, investment checks, and banking documents.

2. **S**ENTENCING **G**UIDELINES

A. **Standard of Proof**

The Court will find sentencing factors by a preponderance of the

evidence.

B. **Guideline Range**

The parties disagree on the applicability of the following

guidelines:

- 7 -

*2B1.1(b)(1)(J): Loss Amount More than $3.5 million.*

The government recommends that the Court determine that defendant's guideline range is **57-71 months**, as set forth on the attached worksheets.  Defendant recommends that the Court determine that his guideline range is **15-21 months**, as set forth in Note 2 and elsewhere in the attached worksheets. The Court is not bound by either party's recommendation concerning the guideline range, and defendant understands that he will have no right to withdraw his guilty plea if the Court does not follow his recommendation.

Neither party may take a position concerning the applicable guidelines that is different from any position of that party as reflected in the attached worksheets.

3.    <u>SENTENCE</u>

The Court will impose a sentence pursuant to 18 U.S.C. § 3553, and in doing so must consider the sentencing guideline range.

A.    **Imprisonment**

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the government makes a non-binding recommendation that the sentence of imprisonment be no more than the top of the sentencing guideline range it recommends to the Court.

B.    **Supervised Release**

A term of supervised release follows the term of imprisonment. The Court **must** impose a term of supervised release on Count One of no less than **one year or more than three years.**  The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

C.    **Special Assessment**

Defendant will pay a special assessment of **$100** and must provide the government with a receipt for the payment before sentence is imposed.

### D.    Fine

There is no agreement as to fine.

### E.    Restitution

The parties agree that Defendant must pay restitution for the total amount of losses.  The government maintains that restitution will be approximately **$4.5 million (to be jointly and severally paid with other co-conspirators).**  The government will provide a list of victims and the amount each is owed in restitution at the time of sentencing.  The defendant maintains that restitution should be less.

### F.    Forfeiture

As part of this agreement, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(8), and 28 U.S.C. § 2461(c), Defendant agrees to forfeit to the United States his interest in all property, real and personal, which constitutes or is derived from the gross proceeds of his violation of 18 U.S.C. § 1349, as alleged in Count One of the First Superseding Indictment.  Defendant agrees that any property still in his possession

that he obtained as a result of the conspiracy to commit wire/mail fraud shall be forfeited to the United States.

**Money Judgment.** Pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(8), 28 U.S.C. § 2461(c), and Fed.R.Crim.P.32.2, defendant also agrees to the entry of a personal forfeiture money judgment against him in favor of United States which will be equal to the gross proceeds, or a portion thereof, of the defendant's conspiracy to violate 18 U.S.C. § 1349 as charged in Count One of the First Superseding Indictment. Defendant agrees that the amount of the forfeiture money judgment will be equal to the amount of restitution ordered in this case, or in any other amount agreed upon by the parties before sentencing. Defendant shall be jointly and severally liable for the forfeiture money judgment with all other defendants found guilty of violating the conspiracy alleged in Count One of the First Superseding Indictment.

Defendant agrees that the forfeiture money judgment may be satisfied, to whatever extent possible, from any property owned or under the control of defendant. To satisfy the money judgment,

defendant explicitly agrees to the forfeiture of any assets he has now, or may later acquire, as substitute assets under 21 U.S.C. § 853(p)(2) and waives and relinquishes his rights to oppose the forfeiture of substitute assets under 21 U.S.C. § 853(p)(1) or otherwise.

**Orders of Forfeiture.** Defendant agrees to the entry of any necessary orders of forfeiture, including the entry of a Preliminary Order of Forfeiture, at or after the time his guilty plea is entered, incorporating the forfeiture money judgment and any property identified before sentencing that is subject to forfeiture. Defendant agrees to sign and stipulate to such an order at or before sentencing, or otherwise consent to such an order through defendant's counsel when such consent is requested by the government.

**Forfeiture Cooperation.** Defendant agrees that he will cooperate with the United States by identifying all property known to him, in which he or any other person has a legal or equitable interest, which constitutes or is derived from the proceeds of his violation of Count One of the First Superseding Indictment. Defendant agrees that

he will take whatever steps are necessary to deliver possession of, and clear title to, each property to be forfeited to the United States and will execute such legal documents as may be required to transfer title to the United States and by taking whatever steps are necessary to ensure that the property is not sold, disbursed, hidden, wasted or otherwise made unavailable for forfeiture.  Defendant also agrees to testify truthfully in any forfeiture proceeding concerning forfeitable assets, if requested to do so by the government.

Defendant agrees to furnish a financial statement to the attorneys for the government assigned to this case at or before sentencing, which may be used in any lawful manner to collect the money judgment amount, and which may be disclosed to any agencies or personnel of the government for that purpose.  The financial statement shall disclose and list all assets, funds and property of any kind in which defendant has an interest, all liens and encumbrances against such assets, funds and property, and all of the defendant's liabilities.  When submitted, the financial statement must be signed by the defendant under oath or as

an unsworn declaration under penalty of perjury. The defendant further agrees to undergo any polygraph examination the United States may choose to administer concerning any property subject to forfeiture.

**Waivers.** In entering into this agreement with respect to forfeiture, Defendant expressly waives his right to have a jury determine the forfeitability of his interest in the Subject Property as provided by Rule 32.2(b)(5) of the Federal Rules of Criminal Procedure.

In entering into this agreement with respect to forfeiture, Defendant knowingly, voluntarily, and intelligently waives any challenge to the above-described forfeiture based upon the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

Defendant further waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of assets is part of

the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

### 4. USE OF WITHDRAWN GUILTY PLEA

If the Court allows defendant to withdraw his guilty plea for a "fair and just reason" pursuant to Fed. R. Crim. P. 11(d)(2)(B), defendant waives his rights under Fed. R. Evid. 410, and the government may use his guilty plea, any statement made under oath at the change-of-plea hearing, and the factual basis statement in this plea agreement, against him in any proceeding.

### 5. OTHER CHARGES

If the Court accepts this agreement, the government agrees to dismiss Count 11 against the defendant.

### 6. EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT

The recommendations in Part 3 are not binding on the Court. Defendant has no right to withdraw his guilty plea and the parties have

no right to withdraw from this agreement if the Court decides not to follow them.

7.    **WAIVER OF APPEAL**

Defendant waives any right he may have to appeal his conviction. If the sentence imposed does not exceed the maximum allowed by Part 3 of this agreement, defendant also waives any right he may have to appeal his sentence. If the sentence imposed is within the guideline range determined by Paragraph 2B the government agrees not to appeal the sentence, but retains its right to appeal any sentence below that range.

8.    **CONSEQUENCES OF WITHDRAWAL OF GUILTY PLEA OR VACATION OF CONVICTION**

If defendant is allowed to withdraw his guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing him to withdraw his guilty plea

- 16 -

becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea or to any conduct reflected in the attached worksheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

9.   **PARTIES TO PLEA AGREEMENT**

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

10.   **SCOPE OF PLEA AGREEMENT**

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written

promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

11. ACCEPTANCE OF AGREEMENT BY DEFENDANT

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by **5:00 P.M. on April 8, 2016.** The government reserves the right to modify or revoke this offer

- 18 -

at any time before defendant pleads guilty.

BARBARA L. MCQUADE
United States Attorney

JOHN NEAL
CHIEF, WHITE COLLAR CRIME UNIT

CRAIG A. WEIER                    3/24/16
ASSISTANT UNITED STATES ATTORNEY

BY SIGNING BELOW, DEFENDANT ACKNOWLEDGES THAT HE HAS READ (OR BEEN READ) THIS ENTIRE DOCUMENT, UNDERSTANDS IT, AND AGREES TO ITS TERMS. HE ALSO ACKNOWLEDGES THAT HE IS SATISFIED WITH HIS ATTORNEY'S ADVICE AND REPRESENTATION. DEFENDANT AGREES THAT HE HAS HAD A FULL AND COMPLETE OPPORTUNITY TO CONFER WITH HIS LAWYER, AND HAS HAD ALL OF HIS QUESTIONS ANSWERED BY HIS LAWYER.

DAVID BURGESS
ATTORNEY FOR DEFENDANT
DATE: 4-12-16

STEVEN GOLDSTEIN
DEFENDANT
DATE: 4-12-16                    4-12-16

BILL CLAY
ATTORNEY FOR DEFENDANT
DATE: 4-12-16

# WORKSHEET A   (Offense Levels)[1]

| | | |
|---|---|---|
| Defendant: | D-16 Steven Goldstein | Count(s): 1 |
| Docket No: | 14-20599 | Statute(s): 18 U.S.C. § 1349 (conspiracy to commit wire fraud) |

Complete one Worksheet A for each count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction) before applying the multiple-count rules in U.S.S.G. ch. 3, pt. D.  However, in any case involving multiple counts of con-viction, if the counts of conviction are all  "closely related" to each other within the meaning of  U.S.S.G. § 3D1.2(d), complete only a single Worksheet A.

## 1.   BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS  (U.S.S.G. ch. 2)

| Guideline Section | Description | Levels |
|---|---|---|
| 2B1.1(a)(1) | Base Offense Level | 7 |
| 2B1.1(b)(1)(I) | Losses Exceed $3.5m but less than $9.5m (appx.$4.5m)[2] | 18 |
| 2B1.1(b)(2)(A) | 10 or more victims/mass marketing/subst.hardship >1vic. | 2 |
| | | |
| | | |
| | | |

## 2.   ADJUSTMENTS  (U.S.S.G. ch. 3, pts. A, B, C)

| Guideline Section | Description | Levels |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## 3.   ADJUSTED OFFENSE LEVEL

Enter the sum of the offense levels entered in Items 1 and 2.  If this Worksheet A does not cover every count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction), complete one or more additional Worksheets A and a single Worksheet B.

**27**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

☒ *If this is the only Worksheet A, check this box and skip Worksheet B.*

---

[1] *Revised February 25, 2016.*
[2] *Goldstein argues that the loss amount should be found to be greater than $40,000 and less than $95,000 resulting in an offense level increase of 6 pursuant to 2B1.1(b)(1)(D).  This loss amount would result in an adjusted offense level of 15, and, after a two-level reduction under 3E1.1(a), a total offense level of 13.  Combined with a criminal history category of II, Goldstein argues that his USSG Guideline Range should be 15-21 months.*

# WORKSHEET C   (Criminal History)

Date of defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses):  April 2013

## 1.    PRIOR SENTENCES

### Prior Sentence of Imprisonment Exceeding 13 Months  (U.S.S.G. §§ 4A1.1(a)):        3 POINTS

Enter 3 points for each prior adult sentence of imprisonment exceeding one year and one month that either (1) was imposed within 15 years of the defendant's commencement of the instant offenses (taking into account relevant conduct and stipulated offenses) or (2) resulted in the defendant's confinement during any part of that 15-year period.  (See U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1), (e)(1).)

### Prior Sentence of Imprisonment of at Least 60 Days  (U.S.S.G. §§ 4A1.1(b)):        2 POINTS

Enter 2 points for each prior sentence of imprisonment of at least 60 days not counted under U.S.S.G. § 4A1.1(a) that either (1) resulted from an offense committed after the defendant turned 18 and was imposed within 10 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(b), 4A1.2(e)(2)) or (2) resulted from an offense committed before the defendant turned 18 and resulted in the defendant's confinement during any part of the 5-year period preceding the defendant's commencement of the instant offense (see U.S.S.G. §§ 4A1.1(b), 4A1.2(d)(2)(A)).

### Other Prior Sentences  (U.S.S.G. §§ 4A1.1(c)):        1 POINT

Enter 1 point for each prior sentence not counted under U.S.S.G. § 4A1.1(a) or (b) that either (1) resulted from an offense committed after the defendant turned 18 and was imposed within 10 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2)) or (2) resulted from an offense committed before the defendant turned 18 and was imposed within 5 years of the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) (see U.S.S.G. §§ 4A1.1(c), 4A1.2(d)(2)(B)).  NOTE:  No more than 4 points may be added under this item.

| Date of Imposition | Status* | Offense | Sentence | Release Date** | Points |
|---|---|---|---|---|---|
| 12/10/2004 | | Conspiracy to commit mail fraud | 30 months | | 3 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

\*    If the defendant committed the offense before turning 18, indicate whether he or she was sentenced as a juvenile (J) or as an adult (A).

\*\*  A release date is required in only three situations:  (1) when a sentence covered under U.S.S.G. § 4A1.1(a) was imposed more than 15 years before the defendant's commencement of the instant offense (taking into account relevant conduct and stipulated offenses) but resulted in his or her confinement during any part of that 15-year period; (2) when a sentence counted under U.S.S.G. § 4A1.1(b) was imposed for an offense committed before the defendant turned 18 but resulted in his or her confinement during any part of the 5-year period preceding his or her commencement of the instant offense (taking into account relevant conduct and stipulated offenses); and (3) when 2 criminal history points are added pursuant to U.S.S.G. § 4A1.1(e) because the defendant committed the instant offense (taking into account relevant conduct and stipulated offenses) shortly after or during imprisonment resulting from a sentence counted under U.S.S.G. § 4A1.1(a) or (b) or while he or she was on escape status for such a sentence.

(rev. 06/99)

**2.   COMMISSION OF INSTANT OFFENSE WHILE UNDER PRIOR SENTENCE (U.S.S.G. § 4A1.1(d))**

Enter 2 points if the defendant committed any part of the instant offense (taking into account relevant conduct and stipulated offenses) while under any criminal justice sentence having a custodial or supervisory component, including probation, parole, supervised release, imprisonment, work release, and escape status. (*See* U.S.S.G. §§ 4A1.1(d), 4A1.2(m), (n).) List the type of control and identify the sentence from which it resulted.

**3.   PRIOR SENTENCE RESULTING FROM CRIME OF VIOLENCE (U.S.S.G. § 4A1.1(f))**

Enter 1 point for each prior sentence resulting from a conviction for a crime of violence that did not receive any points under U.S.S.G. § 4A1.1(a), (b), or (c) because such sentence was considered related to another sentence resulting from a conviction for a crime of violence. But enter no points where the sentences are considered related because the offenses occurred on the same occasion. (*See* U.S.S.G. §§ 4A1.1(f), 4A1.2(p).) Identify the crimes of violence and briefly explain why the cases are considered related. NOTE: No more than 3 points may be added under this item.

**4.   TOTAL CRIMINAL HISTORY POINTS**

Enter the sum of the criminal history points entered in Items 1-4.

| | |
|---|---|
| | **3** |

**5.   CRIMINAL HISTORY CATEGORY**

| Total Criminal History Points | Criminal History Category |
|---|---|
| 0 – 1 | I |
| 2 – 3 | II |
| 4 – 6 | III |
| 7 – 9 | IV |
| 10 – 12 | V |
| ≥ 13 | VI |

**II**

(rev. 06/99)

# WORKSHEET D   (Guideline Range)

**1.**   **(COMBINED) ADJUSTED OFFENSE LEVEL**

> Enter the adjusted offense level entered in Item 3 of Worksheet A or the combined adjusted offense level entered in Item 8 of Worksheet B.

| 27 |

**2.**   **ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY   (U.S.S.G § 3E1.1)**

| -3 |

**3.**   **TOTAL OFFENSE LEVEL**

> Enter the difference between Items 1 and 2.

| 24 |

**4.**   **CRIMINAL HISTORY CATEGORY**

> Enter "I" if the defendant has no criminal history.  Otherwise, enter the criminal history category entered in Item 6 of Worksheet C.

| II |

**5.**   **CAREER OFFENDER / CRIMINAL LIVELIHOOD / ARMED CAREER CRIMINAL (U.S.S.G. ch. 4, pt. B)**

> a.   <u>Total Offense Level</u>:  If the career offender provision (U.S.S.G. § 4B1.1), the criminal livelihood provision (U.S.S.G. § 4B1.3), or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a total offense level higher than the total offense level entered in Item 3, enter the higher offense level total.

> b.   <u>Criminal History Category</u>:  If the career offender provision (U.S.S.G. § 4B1.1) or the armed career criminal provision (U.S.S.G. § 4B1.4) results in a criminal history category higher than the criminal history category entered in Item 4, enter the higher criminal history category.

**6.**   **GUIDELINE RANGE FROM SENTENCING TABLE   (U.S.S.G. ch. 5, pt. A)** [3]

> Enter the guideline range in the Sentencing Table (*see* U.S.S.G. ch. 5, pt. A) produced by the total offense level entered in Item 3 or 5.a and the criminal history category entered in Item 4 or 5.b.

| 57-71 mos. |

**7.**   **STATUTORY RESTRICTIONS ON OR SUPERSESSION OF GUIDELINE RANGE**

> If the maximum sentence authorized by statute is below, or a minimum sentence required by statute is above, the guideline range entered in Item 6, enter either the guideline range as restricted by statute or the sentence required by statute. (*See* U.S.S.G. § 5G1.1.) If the sentence on any count of conviction is required by statute to be consecutive to the sentence on any other count of conviction, explain why.

_____

_____

(rev. 06/99)

---

[3]   *As noted in note 2, above, Goldstein argues that his Guideline Range should be 15-21 months.*

# WORKSHEET E   (Authorized Guideline Sentences)

**1.   PROBATION  (U.S.S.G. ch. 5, pt. B)**

   a.   <u>Imposition of a Term of Probation</u>  (U.S.S.G. § 5B1.1)

☒   1.   Probation is not authorized by the guidelines (minimum of guideline range > 6 months or statute of conviction is a Class A or a Class B felony).  If this box is checked, go to Item 2 (Split Sentence).

☐   2.   Probation is authorized by the guidelines (minimum of guideline range = zero months).

☐   3.   Probation is authorized by the guidelines, provided the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention satisfying the minimum of the guideline range (minimum of guideline range > 0 months but ≤ 6 months).

   b.   <u>Length of Term of Probation</u>  (U.S.S.G. § 5B1.2)

☐   1.   At least 1 year but not more than 5 years (total offense level ≥ 6).

☐   2.   No more than 3 years (total offense level < 6).

   c.   <u>Conditions of Probation</u>  (U.S.S.G. § 5B1.3)

   The court must impose certain conditions of probation and may impose other conditions of probation.

**2.   SPLIT SENTENCE  (U.S.S.G. § 5C1.1(c)(2), (d)(2))**

☒   a.   A split sentence is not authorized (minimum of guideline range = 0 months or > 10 months).

☐   b.   A split sentence is authorized (minimum of guideline range > 0 months but ≤ 10 months).  The court may impose a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for imprisonment, provided that at least one-half of the minimum of the guideline range is satisfied by imprisonment (if the minimum of the guideline range is 8, 9, or 10 months), or that at least one month is satisfied by imprisonment (if the minimum of the guideline range is 1, 2, 3, 4, or 6 months).  The authorized length of the term of supervised release is set forth below in Item 4.b

**3.   IMPRISONMENT  (U.S.S.G. ch. 5, pt. C)**

A term of imprisonment is authorized by the guidelines if it is within the applicable guideline range (entered in Item 6 of Worksheet D).  (*See* U.S.S.G. § 5C1.1).

(WORKSHEET E, p. 2)

4.  **SUPERVISED RELEASE  (U.S.S.G. ch 5., pt. D)**

> a.  <u>Imposition of a Term of Supervised Release</u>  (U.S.S.G. § 5D1.1)
>
> The court must impose a term of supervised release if it imposes a term of imprisonment of more than one year, or if it is required to do so by statute.  The court may impose a term of supervised release if it imposes a term of imprisonment of one year or less.
>
> b.  <u>Length of Term of Supervised Release</u>  (U.S.S.G. § 5D1.2)

☐    1.  At least 3 years but not more than 5 years, where the count of conviction is a Class A or a Class B felony, i.e., an offense carrying a maximum term of imprisonment ≥ 25 years.

☒    2.  At least 1 year but not more than 3 years, where the count of conviction is a Class C or a Class D felony, i.e., an offense carrying a maximum term of imprisonment ≥ 5 years but < 25 years.

☐    3.  1 year, where the count of conviction is a Class E felony or a Class A misdemeanor, i.e., an offense carrying a maximum term of imprisonment > 6 months but < 5 years.

☐    4.  The statute of conviction requires a minimum term of supervised release of _____ months.

> c.  <u>Conditions of Supervised Release</u>  (U.S.S.G. § 5D1.3)
>
> The court must impose certain conditions of supervised release and may impose other conditions of supervised release.

5.  **RESTITUTION (U.S.S.G. § 5E1.1)**

☐    1.  The court will determine whether restitution should be ordered and in what amount.

☒    2.  Full restitution to the victim(s) of the offense(s) of conviction is *required* by statute.  (*See, e.g.,* 18 U.S.C. §§ 3663A, 2327.)  The parties agree that full restitution is $ __TBD (approximately $4.5m to be joint and several with co-conspirators)__[4]

☐    3.  The parties agree that the court may order restitution to the victim(s) of the offense(s) of conviction in any amount up to and including $_____.  (*See* 18 U.S.C. §§ 3663(a)(3).)

☐    4.  The parties agree that the court may *also* order restitution to persons other than the victim(s) of the offense(s) of conviction.  (*See* 18 U.S.C. §§ 3663(a)(1)(A), 3663A(a)(3).)

☐    5.  Restitution is not applicable.

(rev. 06/99)

---

[4] *Goldstein reserves the right to argue a lesser restitution figure at sentencing.*

**(WORKSHEET E,  p. 3)**

6.   **FINE  (U.S.S.G. § 5E1.2)**

   a. Fines for Individual Defendants

   The court must impose a fine unless "the defendant establishes that he [or she] is unable to pay and is not likely to become able to pay any fine." (*See* U.S.S.G. § 5E1.2(a).)  Generally, the fine authorized by the guidelines is limited to the range established in the Fine Table.  (*See* U.S.S.G. § 5E1.2(b).)  However, there are exceptions to this general rule.  (*See* U.S.S.G. § 5E1.2(b), (c)(4).)

   b. Fine Range from Fine Table  (U.S.S.G. § 5E1.2(c)(3))

| Minimum Fine | Maximum Fine |
|:---:|:---:|
| $20,000 | $200,000[5] |

7.   **SPECIAL ASSESSMENT(S)  (U.S.S.G. § 5E1.3)**

   The court must impose a special assessment on every count of conviction.  The special assessments for individual defendants are

   $100.00 for every count charging a felony ($50.00 if the offense was completed before April 24, 1996)
   $ 25.00 for every count charging a Class A misdemeanor,
   $ 10.00 for every count charging a Class B misdemeanor, and
   $  5.00 for every count charging a Class C misdemeanor or an infraction.

   The defendant must pay a special assessment or special assessments in the total amount of $    $100.00   .

8.   **ADDITIONAL APPLICABLE GUIDELINES, POLICY STATEMENTS, AND STATUTES**

   List any additional applicable guideline, policy statement, or statute.

9.   **UPWARD OR DOWNWARD DEPARTURE  (U.S.S.G. ch. 5, pts. H & K)**

   List any applicable aggravating or mitigating circumstance that might support a term of imprisonment above or below the applicable guideline range.

(rev. 06/99)

---

[5] *Goldstein argues that the sentencing range should be $5,500 to $55,000 based on an offense level of 13 as set forth above.*